NOT FOR PUBLICATION

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| MYRA JOHNSON,<br><br>Plaintiff,<br><br>v.<br><br>CAROLYN W. COLVIN, ACTING COMMISSIONER OF SOCIAL SECURITY<br><br>Defendant. | Civil Action No.: 12-3688 (CCC)<br><br>**OPINION** |

**CECCHI**, **District Judge.**

## I.    INTRODUCTION

Myra Johnson ("Plaintiff") appeals the final determination of the Commissioner of the Social Security Administration ("Commissioner" or "Defendant") denying Plaintiff disability benefits under the Social Security Act. This Court has jurisdiction to hear this matter pursuant to 42 U.S.C. § 405(g). Submissions made in support of and in opposition to the instant petition have been considered by the Court.[1] The Court decides this matter without oral argument pursuant to Rule 78 of the Federal Rules of Civil Procedure. For the reasons set forth below, the decision of Administrative Law Judge Donna A. Krappa (the "ALJ") is affirmed.

---

[1] The Court considers any new arguments not presented by the parties to be waived. See Brenner v. Local 514, United Bhd. Of Carpenters & Joiners, 927 F.2d 1283, 1298 (3d Cir. 1991) ("It is well established that failure to raise an issue in the district court constitutes a waiver of the argument.").

## II.    BACKGROUND

### A.    Procedural History

Plaintiff applied for Supplemental Security Income ("SSI") from the Social Security Administration ("SSA") on December 11, 2009, alleging disability beginning on October 1, 2005.[2]  (Tr. 191.)  Plaintiff's claim was denied initially and also upon reconsideration on July 29, 2010.  Plaintiff then filed a written request for a hearing on August 10, 2010.  (Tr. 11.)  Plaintiff appeared and testified at a hearing held on February 7, 2011 in Newark, New Jersey.  (Tr. 11.)  The ALJ held the record open for further evidence and for interrogatory responses from medical expert cardiologist Gerald Galst, M.D.  Dr. Galst responded and the ALJ proffered his responses to Plaintiff.  (Def.'s Br. 1.)  Plaintiff requested a supplemental hearing that was held on October 12, 2011, at which Dr. Galst and vocational expert Rocco Meola testified.  (Id.)  In a written opinion dated February 27, 2012, the ALJ determined that Plaintiff was not disabled within the meaning of the Social Security Act (the "Act").  The Appeals Council denied Plaintiff's request for review, which rendered the decision of the ALJ the final judgment of the Commissioner.  (Tr. 1-5.)  Plaintiff initiated the current action, requesting that this Court either reverse the Commissioner's decision, or remand the case for reconsideration.  (Pl.'s Br. 1.)

### B.    Personal and Medical Background

Plaintiff was forty-two years old when she first applied for SSI.  (Tr. 191.)  She completed the tenth grade in approximately 1985.  (Tr. 218.)  Her prior work experience included working as a cashier at a grocery store for three months.  (Tr. 214.)  The ALJ found that Plaintiff has no past employment that qualifies as "prior relevant work" under the Act.  (Tr. 20.)

---

[2] The ALJ's opinion and briefs from Plaintiff and Defendant state that the onset date was December 11, 2009. However, Plaintiff, in her application for SSI benefits, alleged disability beginning October 1, 2005.  (Tr. 191.)

On November 8, 2005, Plaintiff visited the emergency room and was admitted to the hospital, complaining of shortness of breath. (Tr. 285.) Plaintiff had been experiencing shortness of breath since the birth of her tenth child in May 2005. (Tr. 286.) Her medical history shows that she has had asthma since the age of seventeen, but did not have any symptoms since that time. (Tr. 286.) She has smoked half a pack of cigarettes per day for approximately the last nineteen years, and she drank two beers per day for the past seventeen years, before quitting three years ago. (Id.) Plaintiff also has used heroin in the past, before quitting three years ago and is now undergoing methadone treatment. (Id.) Plaintiff has suffered from high blood pressure for seventeen years, but has been noncompliant with follow-up and medication. (Id.)

An electrocardiogram ("ECG") performed during the November 8, 2005 hospital visit was abnormal, with sinus tachycardia. (Tr. 312.) The treating cardiologist Arthur Millman, M.D., performed an echocardiogram that showed dilated cardiomyopathy and an ejection fraction of 30%. (Tr. 315-17.) Dr. Millman also performed a cardiac catheterization, and diagnosed Plaintiff with dilated cardiomyopathy, hypertrophic cardiomyopathy, left ventricular dysfunction, and normal coronary arteries. (Tr. 297-307.) Plaintiff was discharged from the hospital on November 17, 2005 in clinically stable condition. (Tr. 288.) She visited the emergency room again on February 5, 2007 complaining of chest pains. However, Plaintiff left the hospital against medical advice and before more testing could be done. (Tr. 336.)

Plaintiff's cardiac conditions appeared to improve, as shown in a series of tests. In October 2006, a single-photon-emission computed tomography with thallium ("SPECT-thallium") test showed a mildly positive myocardial perfusion and a left ventricular function that was normal with an ejection fraction of 71%. (Tr. 437.) The cardiovascular stress test performed on the same day was "markedly submaximal," and was concluded to be a non-

diagnostic result, since the test was limited due to Plaintiff having taken beta-blockers that morning. (Tr. 442, 73-75.) An echocardiogram performed on January 31, 2007 showed normal left ventricular functioning with an ejection fraction of 60%. (Tr. 450-52.) Additionally, an exercise stress echocardiogram performed on July 9, 2008, showed normal study, including average exercise capacity, normal left ventricular functioning with normal ejection fraction, and no ischemia. (Tr. 451, 387-91.)

Plaintiff had a series of ECG studies between February 2007 and June 2010, with only one showing borderline abnormality. (Tr. 341-42, 366-67, 380, 384-86, 463, 470, 482, 566; for borderline abnormality results see Tr. 518.) Additionally, Trinitas Hospital reports indicate that Plaintiff has normal cardiovascular conditions with heart size normal to percussion, and regular heart rate and rhythm without murmur or gallop. (Tr. 512, 505, 482, 470, 574.) Another record from Trinitas Hospital, dated December 29, 2008, showed normal blood pressure and reported no chest pain, no dyspnea on exertion, no orthopnea, no paroxysmal nocturnal dyspnea, no palpitations, and no syncope. (Tr. 455.)

Plaintiff's most recent test was a Lexiscan thallium stress test conducted on March 30, 2011. (Tr. 598.) The results showed no evidence of ischemia, no evidence of jeopardized myocardium, and normal left ventricular functioning with a low normal ejection fraction of 53%. (Id.) Additionally, on the same date, an echocardiogram was performed that showed a normal study with a normal left ventricle ejection fraction. (Tr. 602.)

Regarding Plaintiff's asthma, records show that Plaintiff has had asthma, but has not had symptoms since the age of seventeen. On June 30, 2008, Plaintiff's treating cardiologist, Dr. Arthur Millman, wrote a letter to Plaintiff's treating internist, Dr. Oberoi, stating that she "had no chest pain or shortness of breath." (Tr. 380) Similarly, Dr. Oberoi reported that the upright

portable chest x-ray taken on November 2, 2010 showed normal lungs. (Tr. 561.) Dr. Oberoi also noted on various occasions that Plaintiff's lungs were symmetrical, clear to percussion and auscultation, with no wheezing, no rhonchi, no rales, and with no accessory muscle use. (Tr. 531, 522, 535-39.) Lastly, records from Trinitas Hospital, dated October 2, 2005 to December 29, 2008 indicated no cough, no shortness of breath, no sputum, and no wheezing. (Tr. 455, 462, 481, 482, 505, 512.)

## III.  **LEGAL STANDARDS**

### A.  **Standard of Review**

This Court has jurisdiction to review the Commissioner's final decision under 42 U.S.C. § 405(g). It is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-finder" and must give deference to the administrative findings. Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992); see also 42 U.S.C. § 405(g). Nevertheless, the Court must "scrutinize the record as a whole to determine whether the conclusions reached are rational" and supported by substantial evidence. Gober v. Matthews, 574 F.2d 772, 776 (3d Cir. 1978) (footnote and internal quotations omitted). Substantial evidence is "'more than a mere scintilla. It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). If the factual record is adequately developed, substantial evidence "may be 'something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.'" Daniels v. Astrue, No. 4:08-cv-1676, 2009 U.S. Dist. LEXIS 32110, at *7 (M.D. Pa. Apr. 15, 2009) (quoting Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966)).

This Court may not set aside the ALJ's decision merely because it would have come to a different conclusion. Cruz v. Comm'r of Soc. Sec., 244 F. App'x. 475, 479 (3d Cir. 2007) (citing Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999)). However, "where there is conflicting evidence, the ALJ must explain which evidence he accepts and which he rejects, and the reasons for that determination." Cruz, 244 Fed. App'x. at 479 (citing Hargenrader v. Califano, 575 F.2d 434, 437 (3d Cir. 1978)). Furthermore, where the opinion from a treating physician is rejected in favor of the opinion of a non-treating physician, the ALJ must adequately explain his reasons and provide the rationale behind his decision. See Brewster v. Heckler, 786 F.2d 581, 585 (3d Cir. 1986). Given the totality of the evidence, including objective medical facts, diagnoses, medical opinions, and subjective evidence of pain, the reviewing court must determine whether the Commissioner's decision is adequately supported. See Curtain v. Harris, 508 F. Supp. 791, 793 (D.N.J. 1981). Generally, medical opinions consistent with other evidence are given more weight, whereas opinions inconsistent with the evidence or with themselves are subject to additional scrutiny against the entire record. 20 C.F.R. § 416.927. Overall, the substantial evidence standard is a deferential standard of review that requires deference to inferences drawn by the ALJ from the facts if they are supported by substantial evidence. Schaudeck v. Comm'r of Soc. Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999).

**B. Determining Disability**

Pursuant to the Social Security Act, to receive Supplemental Security Income Benefits, a plaintiff must show that he is disabled by demonstrating that he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A). Thus,

plaintiff's physical or mental impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." Id. Impairments that affect plaintiff's "ability to meet the strength demands of jobs" with respect to "sitting, standing, walking, lifting, carrying, pushing, and pulling" are considered exertional limitations. 20 C.F.R. § 404.1569(a); Sykes v. Apfel, 228 F.3d 259, 263 (3d Cir. 2000). All other impairments are considered non-exertional. See Sykes, 228 F.3d at 263. Decisions regarding disability are made individually and are based on evidence adduced at a hearing. Sykes, 228 F.3d at 262 (citing Heckler v. Campbell, 461 U.S. 458, 467 (1983)). Congress has established the type of evidence necessary to prove the existence of a disabling impairment by defining a physical or mental impairment as "an impairment that results from anatomical, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3).

The SSA follows a five-step sequential evaluation to determine whether a plaintiff is disabled. 20 C.F.R. § 416.920. The evaluation will continue through each step unless it can be determined at any point that plaintiff is, or is not, disabled. 20 C.F.R. §416.920(a)(4). Plaintiff bears the burden of proof at steps one, two, and four, upon which the burden shifts to the Commissioner at step five. Sykes, 228 F.3d at 263. Neither party bears the burden at step three. Id. at 263, n.2.

At step one, plaintiff's work activity is assessed, and plaintiff must demonstrate that he is not engaging in substantial gainful activity. 20 C.F.R. § 416.920(a)(4)(i). An individual is engaging in substantial gainful activity if he is doing significant physical or mental activities for pay or profit. 20 C.F.R. § 416.927. If plaintiff is engaged in substantial gainful activity, he will

be found not disabled and the analysis will stop, regardless of plaintiff's medical condition, age, education, or work experience. 20 C.F.R. § 416.920(b). If the individual is not engaging in substantial gainful activity, the analysis proceeds to the second step. At step two, plaintiff must show that he has a medically determinable "severe" impairment or a combination of impairments that is "severe." 20 C.F.R. § 416.920(a)(4)(ii). An impairment is severe when it significantly limits an individual's physical or mental ability to perform basic work activities. 20 C.F.R. § 416.920(c). It is not severe when medical evidence shows only a slight abnormality or minimal effect on an individual's ability to work. See Leonardo v. Comm'r of Soc. Sec., No. 10-1498, 2010 U.S. Dist. LEXIS 120944, at *9-11 (D.N.J. Nov. 16, 2010). If plaintiff does not have a medically determinable severe impairment, he is not disabled. 20 C.F.R. §§ 416.920(a)(4)(ii), (c). If plaintiff has a severe impairment, the analysis proceeds to the third step.

At step three, the ALJ must determine, based on the medical evidence, whether plaintiff's impairment matches or is equivalent to a listed impairment found in the Social Security Regulations' "Listing of Impairments" found in 20 C.F.R. § 404, Subpart P, Appendix 1. 20 C.F.R. § 416.920(a)(4)(iii). If the impairments are the same or equivalent to those listed, plaintiff is *per se* disabled. 20 C.F.R. § 416.920(d); Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 119 (3d Cir. 2000). At this point, the ALJ must set forth the reasons for his findings. Burnett, 220 F.3d at 119. The Third Circuit requires that ALJ to identify the relevant listings and explain his reasoning using the evidence. Id. Simple conclusory remarks will not be sufficient and will leave the ALJ's decision "beyond meaningful judicial review." Id.

When plaintiff does not suffer from a listed impairment or an equivalent, the analysis proceeds to step four. At step four, the ALJ must determine whether plaintiff's residual functional capacity enables him to perform his past relevant work. 20 C.F.R. §

416.920(a)(4)(iv). This step involves three sub-steps: (1) the ALJ must make specific findings of facts as to plaintiff's residual functional capacity; (2) the ALJ must make findings regarding the physical and mental demands of plaintiff's past relevant work; and (3) the ALJ must compare the residual functional capacity to the past relevant work to determine whether plaintiff has the capability to perform the past relevant work. Burnett, 220 F.3d at 120. The SSA classifies residual functional capacity and past work by physical exertion requirements ranging from "sedentary" to "very heavy work." See id.; 20 C.F.R. § 404.1567. If plaintiff can perform his past work, the ALJ will find that he is not disabled. 20 C.F.R. § 416.920(f). If plaintiff lacks the residual functional capacity to perform any work he has done in the past, the analysis proceeds to the fifth and last step.

At step five, the Commissioner must show that, based on plaintiff's residual functional capacity and other vocational factors, there is a significant amount of other work in the national economy that plaintiff can perform. 20 C.F.R. § 416.920(a)(4)(v). During this final step, the burden lies with the government to show that plaintiff is not disabled by demonstrating that there is other substantial, gainful work that plaintiff could perform, given her age, education, work experience and residual functional capacity. See Rutherford v. Barnhart, 399 F.3d 546, 551 (3d Cir. 2005); Sykes, 228 F.3d at 263. If the Commissioner cannot show that there are other jobs for Plaintiff in the national economy, then plaintiff is disabled. 20 C.F.R. § 416.920(a)(4)(iv).

## IV.    DISCUSSION

### A.    The ALJ's Decision

The ALJ followed the required five-step analysis in reaching her decision. (Tr. 14-20.) The ALJ concluded that the Plaintiff's impairments are not so severe as to preclude all work activity, since Plaintiff remains capable of performing the exertional demands of medium work

as defined in 20 CFR § 416.967(c). (Tr. 11) The ALJ, crediting vocational expert Mr. Rocco Meola's testimony, also found that Plaintiff remains able to work in a number of jobs in the regional and national economy. (Tr. 12) These jobs exist in significant numbers. (Id.)

At the first step, the ALJ found that Plaintiff had not engaged in substantial gainful activity since October 1, 2005, the alleged onset of Plaintiff's disabilities. (Tr. 14.) At step two, the ALJ, after giving full consideration to the testimony of medical expert cardiologist Dr. Gerald Galst, found that Plaintiff suffered from the following severe impairments: a history of hypertension, polysubstance abuse (recurrent), a history of heart disorder, and a history of asthma. (Tr. 14.) The ALJ found that the other alleged impairments would not limit Plaintiff's ability to perform work activities, either singly or in combination, therefore they were not "severe impairments" as defined in the Regulations. (Id.)

The ALJ went on to conclude at step three that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. First, the ALJ found that Plaintiff's asthma did not rise to the level of severity required to meet or equal the medical listing 3.02 A of the Regulations. (Tr. 15.) The ALJ noted that no physician has opined that the Plaintiff's impairments equal any medical listing. (Id.) Second, the ALJ found that Plaintiff's heart disease did not rise to the level of severity required to meet or equal medical listing 4.04. (Id.)

The ALJ referred to the medical records and wrote:

[The] record does not support a finding of required sign-or-symptom limited exercise test findings; of documented impaired myocardial function with left ventricular ejection fraction of 30 percent or less with a physician's indication of marked limitation of physical activity accompanied by a conclusion that performance of exercise testing would present a significant risk to the individual; or coronary artery disease with the requisite angiographic evidence of narrowing or obstruction resulting in marked limitation of physical activity.

(Tr. 15.)

The ALJ also referred to Dr. Galst's testimony, in which he opined that the severity of Plaintiff's impairments do not meet or equal any listings. (Tr. 593.)

The ALJ proceeded to step four, concluding that Plaintiff was capable of:

> the exertion demands of medium work as defined in 20 CFR § 416.967 (c); specifically, she is able to: lift/carry 50 lbs. occasionally and 25 lbs. frequently; stand/walk for 6 hours in an eight hour work day; sit for 6 hours in an eight hour work day; and perform unlimited pushing and pulling within the weight restriction given. Moreover, regarding the postural and environmental demands of work [the ALJ] find[s] that the [Plaintiff] is able to perform jobs: that require no use of ladders, ropes, or scaffolds; that require frequent (as opposed to continuous) use of ramps or stairs; that require no exposure to unprotected heights, hazards or dangerous machinery; that involve no concentrated exposure to temperature extremes, wetness, and/or humidity; that involve no concentrated exposure to undue amounts of dust or known chemical irritants; and that provide ready access to a restroom. As [to] the mental demands of work, [the ALJ] find[s] that the [Plaintiff] is able to perform the basic mental demands of unskilled work; she is able to: understand, remember and carry out simple instructions; respond appropriately to supervision, co-workers and usual work situations; and deal with changes in a routine work setting.

(Tr. 15.)

To come to this finding, the ALJ considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR § 416.929 and SSRs 96-4p and 96-7p. (Tr. 16) The ALJ found Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms. However, Plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment. (Id.)

Next, the ALJ relying on Plaintiff's testimony from the February 7, 2011 hearing and from Plaintiff's answers to the Function Reports, noted that Plaintiff estimated that she is able to

walk for half a block before she would have to stop because she is out of breath, that she is only able to stand for twenty minutes, and that she has problems sitting due to back pain. (Tr. 19) Plaintiff also stated that she is able to lift a gallon of milk (approximately eight and a half lbs.), but her hands lock due to problems in her bones from arthritis. (Id.) She also stated that she has no problems showering, bathing, or dressing. Plaintiff reported on the Function Report that she is able to bathe, read, prepare daily meals, and food shop. (Tr. 205, 230.) Upon consideration of the above facts and in conjunction with Dr. Galst's opinion that Plaintiff's condition has steadily improved such that she has only mild restrictions, the ALJ found the facts inconsistent with the residual functional capacity assessment.

At step four, the ALJ determined that Plaintiff has no past employment that qualifies as "prior relevant work" under the Regulations. Thus, there is no need to determine whether she is able to return to her prior relevant work. (Tr. 20.)

At step five, the ALJ considered the Plaintiff's age, education, work experience, and residual functional capacity and found that Plaintiff is capable of making a successful adjustment to a job that exists in significant numbers in the economy. (20 CFR § 416.969 and § 416.969(a)) First, the ALJ noted that Plaintiff was born on August 11, 1967, and was 42 years old, which is defined under the Regulations as a "younger individual," on the date the application was filed. 20 CFR § 416.963. Furthermore, the ALJ noted that Plaintiff has a limited education and is able to communicate in English. 20 CFR § 416.964. (Tr. 20.)

The ALJ credited Dr. Galst's testimony, concluding that Plaintiff retained the residual functional capacity to perform medium work that required only the ability to perform the basic mental demands of unskilled work. Dr. Galst testified that Plaintiff's condition has steadily improved such that she only has mild work restrictions. (Tr. 596.) However, the ALJ found

Plaintiff's ability to perform all or substantially all of the requirements of this level of work has been impeded by additional limitations. To determine the extent to which these limitations erode the unskilled medium occupational base, the ALJ sought the opinion of vocational expert Mr. Meola. Mr. Meola testified that Plaintiff remains capable of performing jobs of bagger, stapler, furniture cleaner, frame stripper, and/or carton maker. (Tr. 20-21.) He testified that there are 1,200 available jobs of those type in the regional economy and 30,000 available jobs of those type in the national economy. The ALJ determined that Mr. Meola's testimony is consistent with the information contained in the Dictionary of Occupational Titles. (Id.) In conclusion, the ALJ found Plaintiff to be "not disabled" as defined under the Social Security Act. (Id.)

**B.    Analysis**

Plaintiff asserts that the ALJ's decision is incorrect for several reasons. Plaintiff argues that the decision fails to acknowledge many of her "severe" impairments at step two. Plaintiff further contends that the ALJ gave too much weight to Dr. Gerald Galst's opinion and that the ALJ did not consider the written opinion of Nurse Susan Ann Pepe. Plaintiff also argues that the ALJ did not contact Dr. Mandeep Oberoi, her treating internist, who works with Nurse Pepe, to verify Nurse Pepe's letter. Finally, Plaintiff argues that the ALJ erred in concluding that Plaintiff could perform jobs that exist in significant numbers in the national economy.

> *1. The ALJ Properly Determined That Plaintiff's Heart and Lung Conditions Were Not Severe Impairments.*

Plaintiff argues that the ALJ erred at step two in finding that Plaintiff's only severe impairments were a history of hypertension, polysubstance abuse (recurrent), a history of heart disorder, and a history of asthma. The ALJ found that other impairments alleged by Plaintiff including additional heart and lung conditions, were not severe, as those impairments would not

limit Plaintiff's ability to perform all work activities. This Court finds that the ALJ's decision is supported by substantial evidence.

The claimant bears the burden of proof at step two. <u>Sykes</u>, 228 F.3d at 263. Step two is considered a "threshold step" in which the ALJ determines whether the claimant has a medically severe impairment or combination of impairments. <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140-41, 107 S. Ct. 2287, 96 L. Ed. 119 (1987); Social Security Ruling (SSR) 86-8, 1986 SSR LEXIS 15, at *6-7. An impairment is severe when it significantly limits an individual's physical or mental ability to perform basic work activities. 20 C.F.R. §§ 404.1520(c), 416.920(c). It is not severe when medical evidence shows only a slight abnormality or minimal effect on an individual's ability to work. <u>See Leonardo v. Comm'r of Soc. Sec.</u>, No. 10-1498, 2010 WL 4747173, at *4 (D.N.J. 2010).

There is substantial medical evidence to support the finding that Plaintiff did not have severe hypertension, ischemic heart disease, or irregularity of the heart. Plaintiff's treating cardiologist, Dr. Arthur Millman, wrote a letter to Plaintiff's treating internist, Dr. Mandeep Oberoi, stating that Plaintiff's June 30, 2008 stress test report showed her blood pressure was 110/70 and her pulse was 66 and regular. (Tr. 380.) She had an atrial gallop but no other significant cardiac findings. (<u>Id.</u>) Her electrocardiogram was normal, with a regular sinus rhythm (also known as the normal beating of the heart) at a rate of 81. (<u>Id.</u>) More recently, in a March 20, 2011 stress test ordered by cardiologist Anjum Tanwir, M.D., results show that Plaintiff's blood pressure and heart rate were appropriate. (Tr. 598.)

Additionally, Trinitas Hospital reports from several check-ups indicate that Plaintiff has normal cardiovascular conditions with heart size normal to percussion, and regular heart rate and rhythm without murmur or gallop. (Tr. 512, 505, 482, 470, 574.) Another record from Trinitas

Hospital, dated December 29, 2008, reported normal blood pressure, no chest pain, no dyspnea on exertion, no orthopnea, no paroxysmal nocturnal dyspnea, no palpitations and no syncope. (Tr. 455.)

Similarly, Plaintiff's physicians noted comparable results. For example, treating internist Dr. Oberoi, stated that Plaintiff's heart is normal with regular rate and rhythm in several letters dated from April 21, 2010 to January 20, 2011. (Tr. 522, 531, 535-39.) In a report dated July 29, 2010, Dr. David Schneider, an SSI consulting physician, concluded that Plaintiff's history of hypertension is now well-controlled. (Tr. 527.)

There is also substantial evidence to support the finding that Plaintiff does not suffer from severe ischemic heart disease, or a reduced blood supply of the heart muscle, as indicated in stress test results. In a July 9, 2008 stress echocardiogram test verified by Dr. Arthur Millman, results show a normal study with no significant abnormalities. (Tr. 390.) The treadmill test, where Plaintiff exercised up to stage three for nine minutes, and stopped after fatigue, was normal. (Id.) Dr. Millman concluded that the exercise EKG and the stress echo both show no signs of ischemia. (Id.) Similar results were found in a March 20, 2011 Lexiscan Stress test, which cardiologist Anjum Tanwir, M.D. concluded had no suggestions of ischemia. (Tr. 598.)

Substantial evidence also supports the finding that Plaintiff does not suffer from an irregularity of the heart. In the brief submitted to this Court, Plaintiff argues that Dr. Galst erred in testifying that Plaintiff did not have congestive heart failure after 2005 and erred in testifying that Plaintiff did not have cardiac arrhythmias. (Tr. 75-56.) This argument is unsubstantiated, as the radiology report and physician evaluations indicate that Plaintiff's heart conditions have substantially improved since 2005.

On April 7, 2005, Dr. Herman Robinson stated that there is no cardiomegaly, which is a medical condition where the heart is enlarged. (Id.) Similarly, letters from Dr. Mandeep Oberoi from April 21, 2010 to January 20, 2011 stated that Plaintiff's heart is normal, with normal S1 and S2 sounds. (Tr. 522, 531, 535-39.) There were no murmurs, no rubs, and no gallops. (Id.) Moreover, Dr. Oberoi reported that the upright portable chest x-ray taken on November 2, 2010 showed a normal heart. (Tr. 561.)

Additionally, there is substantial evidence that Plaintiff's other health statistics appear to be normal. During an ER evaluation, records show Plaintiff's calcium level at CA, creatinine level at 141, and BM level at 24, all of which are considered to be normal. (Tr. 81.) Accordingly, the ALJ had no evidentiary basis to conclude that Plaintiff's alleged heart impairments were severe.

Similarly, the ALJ properly rejected Plaintiff's lung problems as severe impairments from his analysis at step two. Plaintiff argues that Dr. Galst erred in concluding the Plaintiff did not have a significant problem with asthma during the relevant times. (Tr. 69, 78.) This argument is unwarranted, as Plaintiff's treating physicians' and hospital visitation records support the finding that Plaintiff has no lung problems.

During her November 2005 hospital visit, Plaintiff stated that she had no asthma symptoms since the age of seventeen. (Tr. 17.) While she visited the hospital several times for shortness of breath from August to December 2005, there were no emergency room visits for this complaint after that time. (Tr. 285-332, 479-84, 492-502, 509-14.) On June 30, 2008, Plaintiff's treating cardiologist, Dr. Arthur Millman, wrote a letter to Plaintiff's treating internist, Dr. Oberoi, stating that she "had no chest pain or shortness of breath." (Tr. 380.) Similarly, Dr. Oberoi reported that the upright portable chest x-ray taken on November 2, 2010 showed normal

lungs. (Tr. 561.) Dr. Oberoi also noted during various check-ups that Plaintiff's lungs are symmetrical, clear to percussion and auscultation with no wheezing, no rhonchi, no rales, and no accessory muscle use. (Tr. 531, 522, 535-39.) Lastly, records from Trinitas Hospital, from November 2, 2005 to December 29, 2008 show no cough, no shortness of breath, no sputum, and no wheezing. (Tr. 455, 462, 481, 482, 505, 512.) There was one finding of diminished breath sounds during Plaintiff's consultative examination, but seeing as Plaintiff consistently had negative chest x-rays, this was not a significant finding. (Tr. 517, 76-77, 342, 365, 431, 457, 463, 517, 561.) As such, Plaintiff did not provide sufficient evidence that her lung ailments were severe and the ALJ was therefore correct in rejecting it as a severe impairment.

Plaintiff also alleges to have hepatomoegaly, anemia, low red blood count, low hemoglobin, low potassium, and high creatinine. However, Plaintiff failed to show that these conditions were severe. There is no evidence to suggest that Plaintiff consistently suffered from hepatomoegaly, besides one single occasion. (Tr. 544, 549.) Further, laboratory testing indicated only one incidence of low red blood count. (Tr. 542) Other tests indicate that she had normal hemoglobin, normal potassium, and normal creatinine and that she did not suffer from anemia. (Tr. 469, 524, 542, 554, 556, 558, 559, 606.) Accordingly, the ALJ properly found that these were not severe ailments based on the evidence in the record. Therefore, the Court affirms the ALJ's finding at step two.

### 2. The ALJ Gave Proper Weight to the Opinion Evidence of Dr. Gerald Galst

Plaintiff argues that the ALJ placed too much weight on the testimony of medical expert Dr. Gerald Galst, a board-certified internist and cardiologist, who testified at the October 12, 2011 supplemental hearing. (Pl.'s Br. 9; Tr. 17.) Plaintiff argues that Dr. Galst was allowed to contradict every finding of her treating physicians, including her treating cardiologist. Plaintiff

alleges that the ALJ placed conclusive weight on the opinion of her chosen medical advisor to the exclusion of every other opinion in the record. (Pl. Br. 9.)

The ALJ found that Dr. Galst's opinion was consistent with the evidence as a whole and the Court agrees. (Tr. 17.) Dr. Galst testified to Plaintiff's heart and lung conditions, stating that Plaintiff has never had ischemic heart disease and does not have cardiac arrhythmias. (Tr. 73, 76.) Plaintiff had cardiomyopathy and congestive heart failure in 2005, but both conditions have since improved, as evidenced in the record already discussed. (Tr. 71.) Dr. Galst testified that "at the present time, based on objective findings, there is really no indication that she has any residual significant cardiomyopathy." (Tr. 69.) He also stated, "her condition has improved and that at this point in time there is very little, if any, evidence that she has any residual cardiac disease in the past year or so of any consequence." (Tr. 70.) Additionally, Dr. Galst testified that Plaintiff had a history of asthma, but further noted that medical records indicate she has not had any significant problems the last several years. (Tr. 69, 78.) Based on the findings previously discussed, the Court agrees with the ALJ's decision to give Dr. Galst's testimony substantial weight, as it is consistent with the totality of Plaintiff's medical record.

Plaintiff makes additional arguments regarding Dr. Galst's testimony, arguing that Dr. Galst erred in stating that certain types of cardiomyopathy are reversible. (Tr. 68.) However, as Defendant points out, Dr. Galst is correct in stating that some cardiomyopathies are reversible, including those from alcohol use, methamphetamine use, cocaine use, and pregnancy. (See Def.'s Br. 8-9.) The record in this case shows that Plaintiff abused alcohol, cocaine, and methamphetamines in the past and that her cardiomyopathy occurred within five months of the birth of her tenth child in May 2005. (Tr. 265-84, 287, 406, 424, 480-81, 489, 495, 498.) Therefore, it appears that Plaintiff's cardiomyopathy may have been reversible.

Plaintiff also argues that Dr. Galst erred in concluding that it is impossible for Plaintiff to suffer ischemic heart disease without having coronary artery disease. Further, Plaintiff contends that Dr. Galst improperly found that Plaintiff did not have congestive heart failure after 2005 and that she did not have any cardiac arrhythmias. However, the record supports Dr. Galst's findings. Plaintiff had normal coronary arteries and there were specific findings of no ischemia in July 2008 and March 2011 by her examining cardiologists Dr. Millman and Dr. Tanwir. (Tr. 290, 598-99). Additionally, echocardiograms in January 2007, July 2008, and March 2011 were normal. (Tr. 387-91, 450-51, 598-603.) Moreover, from December 2005 on, Plaintiff had normal ECG studies, except for one test that showed borderline abnormalities. (Tr. 341-42, 366-67, 380, 384-86, 463, 470, 482, 566; see Tr. 518 for borderline abnormality.)

Plaintiff has not pointed to anything in the record to contradict Dr. Galst's findings. The Court finds that his testimony is consistent with the totality of the Plaintiff's medical records. Accordingly, the ALJ properly evaluated and gave appropriate weight to Dr. Galst's testimony.

### 3. The ALJ Gave Appropriate Consideration to the Opinion of Nurse Susan Ann Pepe

Plaintiff argues that the ALJ did not weigh the opinion of Nurse Susan Ann Pepe, an employee of Dr. Oberoi's office, as a treating source opinion worthy of controlling weight. A "treating source" is a claimant's own physician or other acceptable medical source who has provided the claimant with medical treatment or evaluation, and who has had an ongoing treatment relationship with the claimant. 20 C.F.R. § 416.902. The opinion of a treating source is given "controlling weight" when it is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is not inconsistent with other substantial evidence contained in the record. 20 C.F.R. § 416.927(d)(2).

Here, Nurse Susan Ann Pepe stated that Plaintiff had been diagnosed with hypertension, congestive heart failure, and angina. (Tr. 607.) She went on to opine that given the nature of her conditions, Plaintiff "can have severe exacerbations, which impair her ability to work." (Tr. 607.) The ALJ addressed Nurse Pepe's opinion, finding that it was "not properly rationalized," and not from a physician or comparable medical source under the Regulations. (Tr. 17.) The ALJ found that it is unsupported by medical evidence and the medical expert's testimony.

There is substantial evidence to support the ALJ's findings on this issue. First, a nurse is not considered to be an "acceptable medical source." 20 C.F.R. §§ 416.902, 416.913(a), (d)(1) (listing only licensed professionals including physicians, optometrists, podiatrists, and speech-language pathologists as acceptable medical sources). Moreover, even though Nurse Pepe worked with Dr. Oberoi, there is no indication that Dr. Oberoi agreed with or adopted Nurse Pepe's statement. Therefore, Nurse Pepe's assessment cannot be considered the opinion of an acceptable medical source.

Furthermore, the medical records are inconsistent with Nurse Pepe's evaluations. As already discussed, Plaintiff has suffered from hypertension in the past, but it is now well-controlled. (Tr. 527, 70-77.) Similarly, test results show that Plaintiff does not have congestive heart failure. Echocardiograms in January 2007, July 2008, and March 2011 show normal systolic and diastolic functioning, and low normal-to-normal ejection fractions. (Tr. 387-91, 45-51, 598-603.) Further, it is demonstrated in the medical records that Plaintiff does not have angina. Dr. Oberoi's letters, records from Trinitas Hospital, and also a statement from Plaintiff herself at a hospital visit, all show that Plaintiff does not have chest pain. (Tr. 522, 531-32, 534-40, 598.)

Plaintiff also argues that the ALJ failed to fully develop the record since she did not contact Dr. Oberoi's office to ask for clarification as to whether he agreed with Nurse Pepe's opinion. The Court disagrees. At steps one through four, the burden of persuasion is on Plaintiff. In the present case, the ALJ has a complete and fully developed record under the regulations (20 CFR §416.912) and is not obligated to seek additional information. Where there are no obvious gaps in the administrative record and where the ALJ already possesses a full administrative record, the ALJ is under no obligation to seek additional information. Rosa v. Callahan, 168 F.3d 72, 79, n.5 (2d Cir. 1999). Because the present record has no apparent gaps and includes comprehensive treatment notes from the year 2005-2011 by various treating and consulting physicians and from Trinitas Hospital, this Court finds that the ALJ is under no obligation to verify Nurse Pepe's letter with Internist Dr. Oberoi. Therefore, based on the foregoing, the Court finds that the ALJ properly evaluated and gave appropriate weight to Nurse Pepe's opinion.

### 4. The ALJ Properly Determined that Plaintiff Could Perform Work in the National Economy

The ALJ found that Plaintiff retained the residual functional capacity to perform medium work that required only the ability to perform the basic mental demands of unskilled work. The Court finds that there is substantial evidence to support the ALJ's finding that Plaintiff's impairments would not limit her ability to perform all work activities.

At the supplemental hearing, the vocational expert testified that based on the hypothetical offered by the ALJ, which was based on the Plaintiff's Residual Functional Capacity, Plaintiff would be capable of performing unskilled jobs of bagger, stapler, furniture cleaner, frame stripper, and/or carton maker. (Tr. 84-85.) These types of jobs exist in the amount of approximately 1,200 regionally, and they exist in the amount of 30,000 nationwide. (Tr. 86)

The ALJ, using this finding as well as Plaintiff's age, education, work experience, and residual functional capacity, concluded that Plaintiff is capable of making a successful adjustment to other work that exists in significant numbers in the national economy. (Tr. 21.) Accordingly, the ALJ's finding that Plaintiff was not disabled is supported by substantial evidence.

## V.   <u>CONCLUSION</u>

For the foregoing reasons, the ALJ's decision that Plaintiff is not disabled within the meaning of the Social Security Act is hereby affirmed.

An appropriate Order accompanies this Opinion.

Dated: August _23_, 2013

HON. CLAIRE C. CECCHI
United States District Judge